NO. 380-01106-2008

BOBBY COLE,
LANCE HAYNES,
and ALLEN WEST

§
§
§
§

IN THE DISTRICT COURT

Plaintiffs,

§
§
§

v.

§
§

OF

BRENDA MAMMEL,

§
§
§

COLLIN  COUNTY, TEXAS

Defendant.

§
§
§

380th JUDICIAL DISTRICT

ORIGINAL PETITION AND JURY DEMAND

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW, BOBBY COLE ("Cole"), WILLIAM LANCE HAYNES ("Haynes"), and ALLEN WEST ("West") (collectively "Plaintiffs"), by and through their attorney of record, Rhonda Cates, who files this civil action against the Defendant BRENDA MAMMEL ("Mammel") or ("Defendant"), for defamation per se. In support of their Original Complaint, Plaintiffs hereby allege and state as follows:

Discovery in this lawsuit is intended to be conducted under Level 2 of Rule 190 of the Texas Rules of Civil Procedure.

I.

The Plaintiffs are individuals who are, at times relevant to this lawsuit, fire fighters employed by the City of Plano Texas. The incidents of defamation which are the basis for this lawsuit were committed in Collin County Texas.

2008 MAY 15  PM 1:49

Defendant is an individual who is, at time relevant to this lawsuit, a firefighter employed by the City of Plano Texas. Defendant may be served at 3520 Sherrye Drive Plano, Texas 75074.

II.

This claim and cause of action is instituted to recover damages against Defendant for irreparable actual and exemplary or punitive damages caused and resulting from publishing and uttering untruth and falsehoods concerning the integrity and character of the Plaintiffs. Unquestionably, the Plaintiffs are private figures within the meaning and contemplation of the law, and have had untarnished reputations for truth and veracity with all they have come in contact.

III.

There is attached to and incorporated herein a report of October 7, 2007 styled and entitled "REPORT INVESTIGATION, FINDINGS AND CONCLUSIONS CONCERNING EMPLOYEE GRIEVANCE OF BRENDA MAMMEL CITY OF PLANO, TEXAS" authored by Marigny A. Lanier of the Maris and Lanier, P.C. law firm (hereinafter referred to as "the Report"). Defendant Mammel was on leave for mental health issues when she asserted to Fire Chief Hugo Espara, Chief Bob Acker and Human Resource Director LaShon Ross that the Plaintiffs were responsible for acts that were the genesis of her health issues. Attorney Lanier was requested by the City of Plano to conduct an investigation. She met with Defendant Mammel and the president of the local firefighters association Scott Kerr. During that all day meeting, Defendant

Mammel made verbal statements and furnished her own handwritten and typed

notes to Attorney Lanier with regard to her allegations about the Plaintiffs. The

employees, including the Plaintiffs, identified by Defendant were questioned

separately. They were told that they were not being accused of wrongdoing and

were only questioned as witnesses. All of the employees were told that the

investigation was confidential and that they could not discuss it with anyone

including their own attorney.  However, after the investigation was concluded the

Report was published to the Plaintiffs, their supervisors and other employees.

### III.

Defendant, in utter and reckless disregard for the truth, stated that the

Plaintiffs isolated her, threatened her, ignored her, discriminated against her

because of her gender and frequently committed acts designed to make her ill and

to even kill her. Specifically, she accused Plaintiff West of being a Satan worshiper

and stealing her belongings. Defendant stated that Plaintiff West talked about

Masons and blood brothers who would provide an alibi if one committed murder.

Plaintiff Haynes was accused of threatening to push her into oncoming traffic or

over a bridge while on a call on the side of the highway. Plaintiff Cole was painted

as a racist bully who was close to assaulting a co-worker over a job assignment.

Defendant clearly inferred that the Plaintiffs caused Lieutenant Cook's fatal

motorcycle accident.   Defendant insinuated that the Plaintiffs poisoned her with

pesticide and carbon monoxide from the station stove.  Clear inference can be

drawn that the Plaintiffs are bullies who cause trouble in the work place and will

retaliate against anyone who complains. The investigation exonerated the Plaintiffs

of all such claims and states that her contentions were demonstrated to be erroneous.

IV.

The statements made by the Defendant were uttered in with total malice as that term is understood in law, and in utter and reckless disregard for the rights of the Plaintiffs. Not only did the Plaintiff make these wholly false claims in front of the president of the local association but what makes this case more subject to share is that the Report, full of lies, half-truths, innuendo and inferences that are without support, was published to numerous employees of the City of Plano by human resources. It was emailed as an attachment to the Plaintiffs and their supervisors who were free to forward it to anyone who requested to view the document. The Plaintiffs were appalled to realize that contrary to the confidentiality mandated during the investigation, all of the false and hurtful allegations about themselves and others were now common gossip and were taken as truth by others in the fire department. Their reputations were ruined. What could be worse in a fire station than to be labeled in such a manner to co-workers that you live with, work with, socialize with and trust save your life? Among other rumors, Plaintiffs heard that others thought they should be terminated because they had tried to kill the Defendant. Plaintiffs are highly trained fire fighters who have spent their entire careers in service of others. These false allegations will live with them the rest of their lives.

V.

The extent of the Plaintiffs damages are not fully known. They have already suffered extensive actual damages and losses, not including the mental anguish and suffering brought about by the allegations, the investigation, the inquiries by co-workers, the desultory treatment they have been accorded by management and members of the public. As discovery in this case develops it will no doubt be possible to predict with more accuracy the toll of the humiliation, embarrassment, mental anguish and suffering they have experienced. In addition, Plaintiffs should be awarded exemplary damages in at least an equal amount for the reckless and malicious false statements made by the Defendant.

## VI.

## JURY TRIAL DEMAND

Plaintiffs request a trial by jury on all claims so triable. The jury fee is tendered herewith.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendant be cited to appear and answer herein, and that upon hearing of this cause, the Court grant Plaintiffs the following relief;

(1)   Actual damages;

(2)   Exemplary damages;

(3)   Plaintiffs' attorney fees and costs pursuant to TEXAS CIVIL

PRACTICE & REMEDIES CODE §37.009.

(6)   Post-judgment interest on all amounts awarded, and to pay Plaintiffs'

costs of court.

(7)   Such further relief, whether legal, equitable or injunctive, as the

Court deems necessary and just.

Respectfully submitted,

THE LAW OFFICE OF
RHONDA E CATES PLLC
4430 Lavon Drive Suite 374-127
Garland, Texas 75040
214-454-5998
972-530-2819 fax

By:_____
RHONDA CATES
State Bar No. 24012402

ATTORNEY FOR PLAINTIFFS

# REPORT
# INVESTIGATION, FINDINGS & CONCLUSIONS
# CONCERNING EMPLOYEE GRIEVANCE
## OF
## BRENDA MAMMEL
## CITY OF PLANO, TEXAS

Marigny A. Lanier
Maris & Lanier, P.C.

Report of Investigation
Plano Fire Department Station 7C

I, Marigny Lanier, I have investigated the grievance brought forward by Brenda Mammel. The following is a summary of her complaints and concerns as reported by her and a report of the facts and information collected in the subsequent inquiry and investigation conducted by me along with my conclusions and recommendations.

1.    Grievance Background:

Ms. Mammel met with Chief Hugo Esparza and Chief Bob Acker and then with Human Resources Director LaShon Ross at which time she revealed the history of her problems at station 7. Ms. Mammel has been placed on administrative leave with pay while her grievance is being investigated.

Ms. Mammel asserts that for the last three years of her assignment to station 7, shift stressful workplace. She believes that she has been retaliated against by peers and supervisors on account of her opposition to alleged hostile conduct towards FRS James Henry at station 7. Ms. Mammel was assigned to station 7C from 2002 until June 26, 2006 when she transferred to station 3.

6, she endured retaliatory behavior of her coworkers resulting in the creation of a highly

Ms. Mammel states that she has no complaints about the work atmosphere at station 3. The events surrounding her complaint all began in 2004 and continued through the date of her transfer. According to her, the retaliatory acts stemmed from a station wide controversy over James Henry's desire to transfer to station 7 from station 6. Ms. Mammel says that this controversy and ensuing retaliatory consequences of it for her were the genesis of mental health issues.

She says she did not come forward sooner because of fear of further retaliation against herself and her husband who is a captain in Plano Fire Department, because of fear of involuntary termination and because of a sense of betrayal of her co workers and fear that one or more would not tell the truth or would try to sabotage her. She believed that she would be exposed to further retaliation if she reported misconduct because of the political clout, connections and influence within the fire department with the city manager's office and the city council.

2.    Investigation Process:

I was requested by Plano Human Resources to conduct a workplace investigation. Ms. Mammel was interviewed first on September 12, 2007. She was accompanied by Scott Kerr, the president of the local firefighters union. The interview lasted all day with a lunch break. Notes were taken by me of Ms. Mammel's responses to questions. Ms. Mammel had handwritten and typed notes which she had recently prepared and which she used during the interview to refresh her recollection. I asked her to furnish me a copy and she eventually agreed to do so. I received a copy of her typed notes with superimposed handwritten notations on October 5, 2007.

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 2

Station 7C crew members and officers identified by Ms. Mammel during the interview were questioned separately. Each employee was given a Confidentiality Directive which prohibited disclosure of the subject matter of the interview or any discussion of the investigation. Each employee was also given a Garrity Warning. Notes were taken of each interview. Interviews occurred during the period September 17, 2007 through September 20, 2007.

### 3.     Interview of Ms. Mammel:

The following is a summary of the complaints Ms. Mammel described during her interview and in the personal notes she provided.

A.     Ms. Mammel complained that her first difficult experience during her employment was the announcement of her second pregnancy to Chief Peterson nine years ago. He made a rude remark that he thought she was unable to bear more children. She said the chief screamed in response to her request for light duty and railed about what the Supreme Court says and he then threw a book at Chief Caldwell and said "You handle her." Ms. Mammel was allowed light duty. Later, after her husband had substituted for her on 10 shifts so she could stay home with the new baby, Chief Peterson notified the captain that no further substitution would be permitted.

B.     Shortly after her transfer to station 7 (which she noted had no female facilities), a "pornography" investigation was conducted. She wanted them to know that was not the case. Although requested, Chief Caldwell refused to so inform the crew. After this, she heard from crew members that "only whiners and tattletales go to H.R."

C.     Three years ago, after verbally harassing her about being a female in the fire department, Charlie O'Shel purposefully used a barbeque lighter to singe her hair. Lt. Tawwater was a witness to this. It occurred when his nephew was visiting the fire department. She left the station on sick leave and did not return the next shift. Lt. Tawwater later called her at home and inquired about her well being. She told him she was "o.k." She thinks he should have written Charlie O'Shel up.

D.     Charlie O'Shel and Lance Haynes were constantly "grinding her down."

E.     Retaliation began after she "stood up" for James Henry. Mr. Henry was on temporary assignment to station 7 during a preceptor program at his station. He enjoyed the low level of activity at 7 and expressed a desire to transfer. Members of the 7C crew (Lance Haynes and Bobby Cole) became confrontational over this. Lance Haynes feared he would lose his position to Mr. Henry who was senior. Bobby Cole reportedly did not like

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 3

the increased demand for swinging caused by James Henry as an extra person in the station.

Ms. Mammel observed one controversial encounter between FRS Cole and FRS Henry where there was finger pointing by Cole and harsh words were exchanged about FRS Henry's transfer request. Ms. Mammel made a point of expressing her anger to crewmembers about the way James Henry was being treated. And she complained to Captain Gibbs. She offered to back up Henry's story who had submitted his grievance to the assistant chief, but Captain Gibbs gave her a blase response that he did not need to talk to her and it was all taken care of. She insisted that she should have been interviewed because she was a witness to part of the events. She took it upon herself to confront Bobby Cole, Brian Ingram and Lance Haynes about their offensive conduct and mistreatment of FRS Henry. She also confronted Capt. Gibbs about his refusal to appoint FRS Henry to drive the engine and the captain's use of the phrase "he pulled the race card."

A station meeting which was called to address the controversy that had developed over Henry's transfer request. She believed that the meeting was delayed in order to avoid her attendance. She was supposed to take bereavement leave that evening at 6:30 p.m. and the time of the meeting was repeatedly postponed. She believes that Lt. Tawwater was told to do this and just followed orders. Eventually Lance Haynes told her when the meeting would be. She lost bereavement leave in order to stay for the meeting. She wanted to be there to defend James because he was on vacation at the time and she thought he had no other support. During the meeting, she confronted Marc Dodd. She heard that FRS Dodd previously who told FRS Henry it would be in his best interest to drop his complaint and that FRS Dodd was tape recording his talk in the station about religious subjects and would turn him in for that.

She was unaware that there was an official investigation of the incident. She wonders who was interviewed to determine the circumstances because she was not and she was a witness to a part of the events.

F.      After this, she was isolated and ignored by members of the crew (Bobby Cole, Lance Haynes, Brian Ingram, Marc Dodd in particular) and threatened on a number of occasions. They would not talk with her at the station. She said this did not spill over into work duties – where communication necessary for the performance of duties continued normally.

G.      Ms. Mammel reported in the interview that during a call on the highway, she was threatened by Lance Haynes who, while physically nudging her, said it would only take one bump to push someone into oncoming traffic lanes. He also stated that it wouldn't take much to loose one's balance next to the two inch high edge of the overpass. In her written

notes, she says this commentary was a frequent occurrence.

H.     She was intimidated by Allen West's talk of Masons and blood brothers and their comparison to the fire department. He told her that Masons were blood brothers to the extent that if one committed murder, the others would provide an alibi. Ms. Mammel questioned his motives in telling her this and was frightened by it.

I.     Her bed was vandalized and the frame was bent. When it could not be repaired, a bunk bed was purchased which she objected to. She would not let anyone sleep on the top bunk. She was the brunt of jokes of a sexual nature connected the bunk bed. She complained to Lt. Tawwater and Captain Gibbs that she did not want a bunk bed, but was told they needed the extra sleeping area in a case a swing person needed a bed. At some point, whether before or after this, she was provided a wider bed from a captain's room. Allen West made a remark that it was in case she needed to spread her legs.

J.     She was subjected to harassment connected with chores. When she had laundry duty, the crew would purposefully soil as many towels as possible to increase her work load. Crew members would fill the toilet bowls with feces without flushing when she had latrine duty knowing that she was disgusted by this. When she reported it to Captain Gibbs, he made a joke of it.

K.     She repeatedly had to order identification badges. Her supply of badges would disappear. She suspected purposeful conduct to harass and annoy her.

L.     When Lance Haynes had trash duty, he refused to remove trash from her bathroom. Furthermore, he once made a scene about finding used hypodermic needles in the captain's trash and insinuated that she was bringing them from home to deposit in the trash to expose him to needle sticks. She felt he was targeting her with insinuations about the sensitive subject of her daughter's diabetes and insulin administration.

M.     She felt that Lance Haynes would hover over her when she used the station computers. She suspected he was trying to see if she was filing a complaint.

N.     On an occasion when she was required to drive a police cruiser back to the police station following a call, Lance Haynes quipped that he hoped that the police car did not contain weapons. She thought this insinuated that she was dangerous and would hurt someone.

O.     She and Lance Haynes rode an engine to accompany an ambulance. They used EKG patches during patient care. After the call, she asked him to restock supplies on the engine and relied on him to do so. A call came an hour later which again required EKG

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 5

patches. None were available. Haynes laid blame on her for the failure to restock in front of Lt. Cook.

P.        At a fire call, she and Bobby Cole were supposed to cut off the gas to a dwelling as part of the fire suppression procedure. She showed Cole where two gas cutoffs were. He failed to turn both off. During the post incident briefing, there was discussion about the failure to cut off the gas and the impact on fire suppression efforts. No one accused her of being at fault, but then again no one "stood up" for her. She confronted FRS Cole about why he did not cut off both and he responded he thought that he did. She felt unfairly targeted for criticism.

Q.        At the same fire, she, FRS Cole and FRS Dodd were on the rescue intervention team on standby and were suited out with breathing apparatus ready to intervene to respond to a downed firefighter. At some point, FRS Cole and FRS Dodd engaged and began pulling furniture from the building. When she tried to assist, FRS Dodd told her to stay in stand by position. Because there was no apparent rational for FRS Dodd to insist that she stay ready when they were getting involved in the fire, she suspected retaliatory motives.

R.        On her day off, she saw smoke in a residential area and called 911. She went to the location to insure everyone was out of the house. Later, at the station during talk about the fire at dinner, Marc Dodd asked her in a smart aleck voice "how did you get there so fast?" and "what were you doing there?" She believed he insinuated that she started the fire.

S.        Allen West began retiring early more often than usual. He would read the Satanic Bible in the bunk room where she regularly read before retiring. It made her uncomfortable and she suspected this was the intended result. She also heard there was a voodoo doll with her name on it and things such as her "clock/book" disappeared. It did not seem to be mere coincidence. She questioned his motives.

T.        Lt. Pierson often was a substitute for Lt. Taywater. He told her about his daughter's husband who was a wealthy landowner and ex-convict/drug dealer. He alluded to murders near the man's property associated with drug deals. Pierson told her that the son in law knew lots of people and "could get things done." This as intimidating to her.

Lt. Pierson would also assign her more demanding chores when he was the substitute, such as requiring her to mow, edge, weed-eat and blow the entire property while everyone else was inside. She never knew if he assigned the guys any chores to do at all. Lt. Pierson would tell off color jokes in her presence.

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 6

U.      An unidentified FRS told her frequently about a pesticide that he stored in his greenhouse which has adverse health affects.  She used a blue coffee cup at the station and it was always being hidden.  She became ill after the Henry incident with a seriously low blood count and no apparent cause.  She suggests the possibility that her drink was poisoned with pesticide and also says "I'm sure they didn't do this.

V.      After the Henry incident, many of the crew members moved to the weight room to socialize and watch T.V. leaving her in the common area.  She routinely hung out in the kitchen by herself.  She routinely cooked half the meals.  Coincidentally, the crew discovered during a training class on gas meters that there was a high carbon monoxide reading associated with the stove.  She had been sick during this time and had a low blood count.  She was told by her hematologist that a low blood count coupled with carbon monoxide exposure could cause a heart attack.  She asked Captain Biggerstaff and Lt. Cook to verify this but they never responded.  She implied that she was concerned that she was being sabotaged purposefully.

W.      She raised concerns with Captain Biggerstaff and Lt. Cook about her fears of coming to work.  She spoke to them only in vague terms without any details.  Capt. Biggerstaff asked her if anything had happened since he took over the shift and she said "no." He opined that there was a divided shift.  She told the captain that she shouldn't be afraid to come to work.  She also says that the crew was "good around him", spoke to her kindly and were nice when she was present.  She says the captain did not have any idea what she went through.

X.      She put in a transfer request for station 11C.  The request was initially granted, but later was revoked.  She expected at the time that FRS Nugent who had more seniority would request transfer to 11C and it would be granted to him over her.  As it turned out, Nugent had been on sick leave and was not at work the day the written request was due.  Chief Thompson had notified all concerned that the deadline to request a transfer was mandatory.  Chief Thompson thereafter made an exception for FRS Nugent and rescinded FRS Mammel's transfer to 11C even though it had female facilities.  FRS Mammel heard from FRS Trish Swavey that FRS Nugent had claimed "reverse discrimination" and that was why Chief Thompson changed the deadline for him.  Chief Thompson, however, did provide FRS Mammel with a transfer to station 6C which she says was a satisfactory alternative.  FRS Mammel also believes that Trish Swavey and James Henry were denied their preferences for transfer because of gender and race.  She believed she could not complain because Chief Thompson was her husband's supervisor in training.

Y.      A police officer brought in a "bong" which was found outside the station door.  Crew members would walk by her shaking their heads.  She wonders what they were implying.

Z.    The captain told people she was menopausal. She also has told people she is menopausal.

AA.    Lt. Cook was helpful and supportive of her while he was at station 7. She was going to transfer to station 3 where he would be captain when he was promoted. The only person who helped her and listened to her ended up dying in a motor cycle accident. Is this coincidental? She does not think they would hurt him.

4.    **Findings of facts and analysis:**

Based on the interviews with FRS Mammel and fire rescue specialists, captains and chiefs, I have made the following findings of fact and conclusions regarding the circumstances surrounding FRS Mammel's report.

*Early experience with Chief Peterson and Chief Caldwell*

There does not appear to be any causal connection between FRS Mammel's current workplace issues and her unfortunate experience while obtaining light duty privileges nine years ago during her pregnancy. Nor is there any demonstrated or obvious connection between her current complaints and her request to Chief Caldwell to notify the crew that she did not complain of pornography at station 7 when she first moved there. According to station 7 firefighters, Brenda herself made crew members aware that she was not the source of the complaint and they believed her.

Assuming his refusal to communicate her message reflected some sort of bias at the time, there is no indication that Chief Caldwell was directly influencing affairs at station 7. He was no longer employed at the time of the James Henry complaint in 2004 which FRS Mammel has identified as the most relevant event in her grievance. Nor does it appear that Chief Peterson had any direct connection with the event of which she complains. The James Henry matter was resolved at Chief Thompson's level as will be discussed later.

It appears that she disclosed her experiences with Chief Peterson and Chief Caldwell as anecdotal and historical information. She several times noted that the beginning of the retaliation was the James Henry incident. I don't see that these two experiences with Chief Peterson and Chief Caldwell have a bearing on the central issues of FRS Mammel's grievance, except as background information.

*Charlie O'Shel and the hair singeing incident*

Charlie O'Shel admitted that he singed Brenda Mammel's hair. He asserts it was accidental. There is no question that he was engaging in unacceptable horseplay. FRS

Report of Investigation
Plano Fire Department Station 7/C
October 9, 2007
Page 8

O'Shel said he was flicking the lighter as he walked behind FRS Mammel on his way to the barbeque grill at the station. He says it ordinarily was very difficult to get the lighter to ignite. He says he was surprised when it ignited and was aghast when he realized it was close enough to her hair to singe it. He says he apologized profusely and he is ashamed about his conduct. No one could pinpoint the time this occurred, but all stated that it was a long time ago. Those questioned believed that it occurred before the James Henry incident.

Brenda did not identify this event as one which occurred after the James Henry incident. As will be later discussed, Charlie O'Shel was a supporter of James Henry so he would not have been motivated to retaliate against Brenda for her position.

Marc Dodd said he recalls that Brenda was very angry at Charlie O'Shel about the incident and let him know it. Mr. Dodd said that she typically would stand up for herself when things happened that were over the line. FRS Mammel and FRS. O'Shel had worked together for years and, according to Marc Dodd, she tolerated things his teasing to a far greater degree than with anyone else. Lt. Tawwater and Brian Ingram both witnessed the hair singeing event and also say it was clearly accidental. Both perceived that Brenda and Charlie O'Shel (along with FRS Nunneley) remained close friends in spite of this incident throughout their tenure together at station 7.

Allen West says FRS O'Shel frequently teased Brenda about being a woman in the fire department, but his observation was that she was good natured about it. West observed in general that when something happened that Brenda did not like, she did not hesitate to speak up about it. Others reported that Charlie O'Shel was unabashed in his delivery of jabs and teasing to Brenda which she seemed to take in stride, more so than if it came from other firefighters. I heard several times that Brenda did not hesitate the draw the line on behavior that was unacceptable to her. She and O'Shel were perceived to be good friends and often heard talking of weekend social activities with their families at the O'Shel lake house.

Based on the information collected, I conclude that it was apparent that the hair singeing incident was an unintended consequence and, while offensive and inappropriate for the workplace, it was viewed as a stupid, regrettable prank rather than a hostile vindictive maneuver. FRS Mammel may well have had grounds to complain about Charlie O'Shel's constant teasing and gender based remarks. The general consensus was that he could be very caustic and sarcastic about females in the fire department. However, the general insight was that she never told him it was offensive to her, but at the same time she never hesitated to call down other crew members when their conduct or words were unacceptable and offensive. Furthermore, FRS Mammel knew that she had available formal avenues for redress of her complaint and was encouraged multiple times to bring matters forward.

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 9

## *Fear of retaliation*

If she considered any conduct to be harassment, FRS Mammel clearly would have known at the relevant time that a complaint about the hair singe incident or Mr. O'Shel or the perceived repercussions of her opposition to coworker conduct toward James Henry would have been taken seriously and addressed. Her knowledge would be based on the fact that the city had investigated and addressed pornography at station 7 and on the fact that officers including Lt. Tawwater, Capt. Biggerstaff and Lt. Cook encouraged her to bring forward the details of any complaints she had.

According to Lt. Tawwater, he and FRS Mammel had a good relationship and he felt that she had no reason to hesitate in bringing a complaint to him. He says his wife's employment in the city manager's office played no role in his decision making in the fire department. He had no reason to protect any of the firefighters and would not have used his wife's position to do so assuming he could. Obviously, Lt. Tawwater's denials could be viewed as self serving. On the other hand, FRS Mammel's fears that Lt. Tawwater had so-called political connections which would backfire on her if she complained are completely unfounded and speculative. The mere fact that his wife was employed by the city manager's office does not lead to a conclusion that city officials would ignore employee complaints or commit retribution against the source of a complaint. Furthermore, FRSM ammel could have gone directly to the Human Resources Department in accordance with policy. Moreover, Lt. Tawwater told her directly that if she experienced harassment and wanted it to go farther up the chain, that he would facilitate that. He never implied to her that there would be any repercussions.

Furthermore, FRS Mammel had two definite opportunities to address her concerns with her immediate supervisors. She obliquely brought up her discomfort in very vague terms with Capt. Biggerstaff and Lt. Cook. FRS Mammel told me that she failed to provide any substantive detail. When the captain inquired about specific incidents under his watch, FRS Mammel told him that nothing 'had happened since he took over the shift 7C. That was in March, 2005. Capt. Biggerstaff even followed up with her further via an email and invited her to come forward with specifics which she did not do. Chief Thompson had a similar experience and urged her to address any problems she had. Judging by the extent of his intervention in the James Henry grievance, there is no reason to believe her concerns would have been mishandled or ignored.

I conclude that FRS Mammel's fear of retaliation was unreasonable and that she failed to take advantage of the opportunities to have any grievances addressed at the time they were occurring.

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 10

## *Alleged retaliation as result of the James Henry incident*

FRS Mammel believes that her role in protesting treatment by her coworkers of James Henry was the catalyst for retaliation against her by most of the members of the shift, 7C crew. FRS Mammel made no secret of her strong disapproval of the conduct of coworkers in addressing Mr. Henry's desire to transfer. She also believes that Captain Gibbs inadequately addressed Mr. Henry's complaint implying that because of this, the door was left open for hostility toward her. I did not find conclusive evidence to support either of her beliefs.

From all of the interviews, it became clear that the Henry grievance was a polarizing issue for all of the members of 7C shift. Bobby Cole, Brian Ingram and Lance Haynes were on one side and Charlie O'Shel, Roger Nunneley and Brenda Mammel were on the other. Others, including Marc Dodd and Allen West, were philosophically on the side of FRS Mammel and James Henry et al, at least in terms of their assessment of his treatment by his coworkers. The dynamics among the crew were otherwise complicated.

James Henry was placed at station 7C temporarily in the fall 2004. Mr. Henry had seniority over mostly everyone at station 7. During his tenure in Plano, he had always been assigned at high activity stations. He was relieved to have the respite at 7C which was relatively low key compared to his other assignments. He voiced his interest in a permanent transfer. Lance Haynes, who had been out on extended sick leave, felt that his position at 7C was being threatened, particularly since he was the most junior FRS. The 7C shift was easier for all of the crew, but particularly for a paramedic like Mr. Haynes because it was located in the business district and had fewer calls at night. Bobby Cole resisted Henry's transfer to 7C, also for selfish reasons – the added crew member caused him to have to swing more. FRS Haynes challenged FRS Henry about the transfer request and was profane and verbally aggressive toward him in the presence of Roger Nunneley and his girlfriend. FRS Cole confronted FRS Henry later the same day and poked his finger at him in a pugnacious manner. FRS Henry was being mistreated and that based on his service record, he was entitled to be at the station 7 and to transfer permanently if he wanted, especially since he had "paid his dues" at the more demanding stations. She confronted Bobby Cole and Lance Haynes and also Brian Ingram and made known sternly her disapproval of the highly offensive tactics. James Henry lodged a complaint with Assistant Chief Thompson.

Ms. Mammel also confronted Marc Dodd. Brenda had heard that he had threatened to turn James Henry in if he did not drop his complaint and that he would use tape recorded proof of Mr. Henry talking about religion in the workplace. Mr. Dodd tried to discuss with Brenda that she had misunderstood the reports of his conversation with Mr. Henry. According to MarcDodd, he also was sympathetic to James Henry and had actually

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 11

cautioned him to be careful what he said. Dodd informed me he was carrying a recorder for his own personal protection because things seemed to be getting out of hand. Marc Dodd says he meant the reference to Henry's habit of talking about religion at the station, a violation of an H.R. directive, to be a friendly warning to watch his back with Cole and Haynes who would stop at nothing to protect their places. According to Marc Dodd, both Mr. Henry and FRS Mammel misinterpreted the conversation. Mr. Dodd said he had been off on sick leave when all this occurred and that he came back in the midst of a maelstrom and was being hit from all sides. He says he carried a recorder and told everyone he was recording conversations because the accusations and misunderstandings were rampant. Marc Dodd recalls that Brenda drew conclusions without talking to him and completely shut him off and would not hear his side or allow him to clear up her misconception. He says he was offended that he would be treated that way by a longstanding friend. Dodd insists that it was her closed mind toward him that ended their friendship and that tempered his communication with her after that. Nonetheless, in his mind, Mr. Henry was in the right and Mr. Haynes and Mr. Cole were wrong. Retaliation against her would be inconsistent. Marc Dodd appeared earnest in his statement to me and his explanation of his side of a story that Brenda never heard.

Allen West had a similar experience. He was actually sympathetic to Henry, but his observations of the severity of Cole's conduct were different than Brenda's. He says Brenda interpreted this difference as hostility to Henry when it was not. West was in full agreement that Cole's and Lance's conduct was boorish and uncalled for. Much of what Allen West was accused of by her (i.e. reading the Satanic Bible, talking about Mason brotherhood) calls for an interpretation of his motives. I did not find any objective evidence, circumstantial or otherwise, of a retaliatory motive by West.

Charlie O'Shel says that he too recognized the wrongheededness of Bobby Cole and Lance Haynes' attitudes about Henry's transfer desires. James Henry agrees that Mr. O'Shel, FRS Mammel and Mr. Nunneley were his supporters. Henry knew the three had expressed that they all wanted to see Haynes be removed from the station. Haynes was generally perceived by all to be boorish, loud and self centered. The fact that Charlie O'Shel was aligned with FRS Mammel contradicts any indication of a retaliatory motive by him.

According to FRS Mammel, she approached Captain Gibbs with her concerns and he cavalierly dismissed her stating that he had "taken care of it" and that Battalion Chief Storck had given him the go ahead to handle it "as he pleased." FRS Mammel said that the captain refused to get her story as a witness and implies that nothing was done to address the problem. Gibbs, on the other hand, says he talked to her several times because he knew she was upset and she had seen the incident with Cole and Henry.

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 12

My investigation verified that in November, 2004, Capt. Gibbs, under the direction of Battalion Chief Storck, did interview James Henry, Bobby Cole and Lance Haynes. From all reports, there was no dispute about how the Haynes' confrontation occurred. There was some dispute by Cole as to how aggressive he got in making his points with Henry. Gibbs, at the suggestion of Lt. Tawwater, conducted an "air clearing" meeting in the station and also reiterated the "no tolerance" policy on harassment of "any kind." Haynes and Cole apologized to Henry. Henry was notified that he could escalate any future complaint on such matters above his captain to the district chief or division chief or human resources at any time. Gibbs gave Haynes a written reprimand and Cole a verbal warning. Henry expressed his satisfaction with the process followed to address his concerns. Chief Thompson oversaw this process and documented his communications with the battalion chief about how it would be addressed. FRS Mammel's recollection of the handling of the incident is not accurate. Furthermore, even if it were true that Capt. Gibbs did not interview her, she was given an opportunity to speak about the issues in the station meeting.

When considering all of the different perspectives of the events of fall 2004, I did not find any evidence that Brenda Mammel was singled out or retaliated against because of her expressed views on the treatment of James Henry. She clearly was not alone in supporting Mr. Henry. She was joined by Charlie O'Shel, Roger Nunneley, Allen West and Marc Dodd. The incident caused a rift stationwide, not just against FRS Mammel. And if anyone became a pariah as a result, it was Lance Haynes. I also concluded that the effects of the controversy gradually dissolved back to routine.

## Isolation of Ms. Mammel at work:

FRS Mammel states that she was isolated at work following the Henry incident. She claims that she was left alone in the common area while Cole, Ingram, Dodd and Haynes retreated to the weight room during down time. According to those men, they had the practice of gathering in the weight room to watch television well before the Henry incident. Occasionally Brenda would join them, but she was more likely to go where nobody was. Some speculated that her self isolation had something to do with her daughter's condition. After the Henry incident, she stopped going in the weight room at all. They explained that the attraction of the room from the outset was its separate thermostat which allowed them to regulate the temperature. They deny purposeful exclusion or isolation of her. This is consistent with the fact that FRS Mammel said it was her preference often to retreat to the bunkroom to read in the evening or to hang out otherwise in the kitchen area. Despite all this, the group did convene for meals and movies together.

Lt. Tawwater sensed during the James Henry crisis that FRS Mammel was getting the cold shoulder. He recalls that he instructed his crew against doing this.

Bobby Cole denied that he ever attempted to ostracize her. He believed, however, that her relationship with Brian Ingram, which was once close, cooled considerably after the Henry incident. Brian Ingram agrees, but says nonetheless that Brenda Mammel is someone he would do anything for.

Roger Nunneley says he made no secret of his support for Henry, and he never suffered any repercussions. As far as isolation is concerned, it was his opinion that the Cole, Ingram, Haynes group isolated themselves and not the other way around.

There is no question that the Henry incident caused a rift in 7C. However, based on all the interviews, I cannot conclude that FRS Mammel was targeted for exclusion. There were credible reports that some of her isolation was self imposed and that the healing process was well on its way by the time she transferred.

*Lance Haynes*

Lance Haynes is the alleged culprit in many of FRS Mammel's complaints, the worst of which is that she says he threatened to push her into traffic or over a bridge. Haynes vehemently denies this and says he is extremely safety conscious during response efforts on the highways as he sees this as the paramedic/emt's most vulnerable exposure. He states that he has on many occasions caused his coworkers to move the scene off the road for safety reasons and always is careful to set up traffic barriers cones strategically to provide the most protection. He was visibly indignant at the suggestion he would do this. There is no corroboration of either party's story on this. Several of the firefighters who find Haynes to be loud, boorish and obnoxious also say they would never expect him to engage in such threats. Dodd who rode with him most often never heard any threats being made.

Haynes denied an interest in Brenda's computer use and her conclusion that he thought she was filing a complaint. Haynes did recall an incident of discovering needles in a trash can and admitted he commented openly in her presence on the hazard presented, but denied he ever made insinuations that Brenda put them there. Regarding the allegation he instituted in the presence of the lieutenant that she failed to restock the engine EKG supplies, he did not recall anything like this. He commented it would be both of their responsibility to restock. He knew of one occasion when he did fail to restock med supplies and he took responsibility for it. He did not recall any statement he made regarding guns in a police car when she was driving a vehicle back to the station.

Mr. Haynes said that after the James Henry incident, he curtailed his interaction with most of the crew other than Brian Ingram because of the controversy surrounding himself. He stayed in the weight room most of the time. Nonetheless, he felt that his relationship with Brenda had healed by the end of 2006, mostly as a result of the common

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 14

grief they all felt over the loss of Mike Cook. He described her as a very sympathetic and caring individual. He denied that he ever retaliated against any of his crew members who took an opposite stand on the James Henry issues, including FRS Mammel.

In view of Mr. Haynes' denials and the absence of other objective corroboration for the allegations made about his conduct, the findings are inconclusive as to a retaliatory motive.

*Allen West*

FRS Mammel's complaints that Allen West talked about Masons and blood brothers in a sinister way and read the Satanic Bible in her presence to intimidate her, Mr. West says he does not know what the Satanic Bible is. He says he does not know much about the Masons either except what they learned on the History Channel and from talk with other firefighters. They may have had discussions at the station on the topic. He thinks of other firefighters, including her, as brothers, but would not have referred to "blood brothers." He denies any motive to intimidate Brenda. He said they had worked around each other for years and that they had friendly interactions at work. He bears no hostility over the Henry situation. He denies making sexually oriented remarks related to the wider bed she got when she moved to station 7.

In view of his denials and the absence of other corroboration for the allegations made about his conduct, the finding are inclusive as to retaliation.

*Denial of transfer to station 11.*

Chief Thompson denies that his decision to allow FRS Nugent to apply for a transfer to station 11 after the deadline was in any way the result of a retaliatory motive over the Henry incident. This is credible because the chief was acting behind the scenes to insure that Captain Gibbs and Battalion Chief Storck followed procedure to address the Henry grievance. As far as Nugent was concerned, Thompson did not think it fair to exclude Nugent's transfer request because he was on sick leave the day the transfer request was due. According to Thompson, Brenda's comments about T. Swavey and J. Henry not getting their transfer requests honored is not completely accurate. Swavey got her first choice and Henry got his second choice. Henry did not get his first choice due to the fact that there was not an opening at the station he requested.

Chief Thompson made arrangements for Brenda to transfer to station 3 which she says has been an acceptable alternative. He did so by converting a swing position to a permanent post for her. Given the history of Chief Thompson's supervisory oversight of the Henry incident and his attempts to persuade Brenda to come forward with any

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 15

The report is not sustained.

*Station 7 pranks.*

It was generally agreed that FRS Mammel was the target of pranks. In this regard, everyone interviewed says she was treated no different than almost every other member of the crew. Marc Dodd admitted to facilitating a toilet prank in which he left feces left in the commode without flushing. He said, however, that the point of doing it was to put Brian Ingram on the spot with Brenda who had bathroom cleaning duty at the time. Ingram had teased Brenda that he would do such a prank. Dodd said he thought it would be humorous to set the prank up and let Ingram take the fall for it with Brenda. Dodd says that when Brenda complained to the captain, he ordered Dodd to do the cleaning. FRS Mammel recalls that Captain Gibbs did nothing in response.

Brenda described a situation where the toilet was filled with feces collected there after several uses. No one acknowledged this version of the prank story. Captain Gibbs gave some recognition of toilet related pranks, but said he could not be sure on any specifics.

Dodd said that many of the station pranks were "over the top" by ordinary standards, but said that this was a way of firefighters normalizing the "horrible" things they are exposed to. Without attempting to justify the prank, but rather to put it in their context, he said that feces in a toilet pales in comparison to the task of collecting body parts on the highway scattered in an auto accident. Unquestionably this sort of childish prank should not be condoned in the workplace, but FRS Mammel was not the only person who endured them. I didn't find any evidence that pranks were retaliatory or tied in any way to her support of James Henry.

*Miscellaneous events*

Without admitting he did so, Marc Dodd also defended any remarks he might have made about "fire setting" by FRS Mammel. Although he didn't recall teasing Brenda about this, he explained that if he did, it was meaningless satirical humor.

FRS Mammel did not identify the perpetrator of the insinuations of drug use that she believed were directed at her as a result of a bong left on the station doorstep by another

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 16

unknown party. She did not identify the persons who she says bumped into her in the dark hall and called her "dummy" and "stupid." These matters were included in her written notes, but she did not talk about them during the interview.

Bobby Cole remembered a fire where he was responsible for cutting off the gas valve and was unable to do it because of misunderstanding about the location of the cut off. His recollection of the event differs from Brenda's. He did not recall that she pointed to two valves and told him to cut off both of them. He recalls that the second valve was in an odd location and that he could not find it because of the amount of smoke obscuring the field. However, the point she made was that Cole's failure to take responsibility made her look bad. She also argues that he lied about what she told him to do. Cole says he did acknowledge during the post incident briefing that he did not find the gas cutoff. More importantly, he says that these types of shortcomings during a fire suppression event are routinely the topic of discussion during a post incident debriefing for the purpose of improvement and not to lay blame at any firefighter's feet. Cole points out that neither he nor Brenda were alone in failing to have perfect performance at a fire.

Marc Dodd explained that a RIT team functions under the direction of the fire commander and takes orders accordingly. He says any instruction he might have given to her at a fire scene would have been handed down from fire command. Neither he or Bobby Cole recalled the specific incident.

Lt. Tawwater was in a position to observe the culture and climate in the station. He said he had a good relationship with Brenda. He, along with several other firefighters, observed that Brenda was not shy about standing up for James Henry and standing up against behavior by firefighters which crossed the line or was offensive to her.

FRS Mammel relies on conjecture that firefighters committed deliberate acts to harm her with pesticide and carbon monoxide poisoning from the station stove. Even FRS Mammel states in her written notes as afterthought, "I'm sure they didn't do this." Likewise, her suggestion that Lt. Cook lost his life in a motor cycle accident because of his support for her is disturbing speculation.

There are two sides to many of the anecdotes that Brenda offered to suggest that she was subjected to subtle forms of sabotage by her coworkers. As to others, Brenda admittedly presents conjecture and speculation about motives of unidentified persons. Based on the interviews, I conclude that her characterization of these incidents and the interpretation of the motives of others were not reasonable. There is insufficient evidence to conclude that these incidents were the result of hostile motives directed to her.

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 17

*Attitude Toward Brenda Mammel*

All of the firefighters I asked stated that FRS Mammel was a respected member of the crew. She was described as hard working and committed. Her skills in emergency medical service were praised by Lt. Tavwater and others. It was noted that she had some weaknesses in some rescue skill areas, but when she got training in such things as using the concrete saw, she improved. Captain Gibbs recalled that she did not hesitate to take on harder jobs and was very strong and capable. She was described as a "respected" and a "very good" member of the fire department. Most of those I talked to were very concerned about her well being.

5.   Conclusions derived from investigation facts:

The investigation did uncover some conduct which would have warranted some corrective measures had it been timely raised. However FRS Mammel's delay in reporting it to calls into question whether it was seriously perceived by her as harassment at the time. Most of the reported events would have occurred before March, 2005 when Captain Biggerstaff took over 7C, but in no event after FRS Mammel's June, 2006 transfer to station 3.

Overall, the facts demonstrate that the complaint procedure in the Plano policy no. 219.000 is functional and generally effective in the Fire Department. FRS Mammel, according to reports, was quick to notify her peers if their conduct was unacceptable. Supervisors were cognizant of the conflict which emerged from the Henry incident and were proactive in stopping any lasting repercussions. From all reports, the friction that developed healed over time for apparently all but FRS Mammel. Captain Gibbs under the direction of his superiors intervened with disciplinary action and a station meeting calculated to air all grievances and bring closure to the matter. The Fire Department has several times investigation or opportunity to correct. Her failure to respond prevented any timely ever vague allegations of concerns she had. Her failure to respond prevented any timely Captain Biggerstaff pursued FRS Mammel to come forward with specifics when she raised demonstrated its commitment to prohibiting and prevention of harassment and retaliation and there is no basis to conclude that any retribution would have followed a complaint. It was not reasonable for FRS Mammel not to have come forward sooner.

As far as the various episodes which FRS Mammel says stemmed from retaliatory motives of her coworkers, in several cases, I did not find factual basis to support the conclusion other than her allegations. In several cases, her contentions were demonstrated to be erroneous. In others, her conclusions were based on speculation about bad motives. Concerning Lance Haynes and Allen West, it was a "he said, she said" circumstance with nothing objective to tip the balance. The lack of substantiation does not

Report of Investigation
Plano Fire Department Station 7C
October 9, 2007
Page 18

permit a conclusion that retaliation or harassment was occurring. In instances where there was corroborating evidence that something occurred, there was also information provided that demonstrated that she was not singled out as she implied. In other instances, where there was corroboration, the circumstances simply did not demonstrate behavior which could reasonably be perceived as objectionable harassment or retaliation.

There was some admitted behavior that was clearly objectionable. However, in any instances of admittedly objectionable conduct, I discovered no evidence of a concerted agenda of the crew or any individual member to isolate, threaten, demean or intimidate FRS Mammel because of her support of James Henry.

For these reasons, the grievance complaint generally should not be sustained. On the other hand, in the interest of reinforcing the city's "no tolerance" policy, it would be advisable to counsel, coach and train fire department members that pranks of any sort are unacceptable, unprofessional conduct and that sensitivity to each other's differences is essential for a harmonious, inclusive and cohesive working relationship. This, of course, would address the admitted participation in the pranks and the gender based teasing which was clearly occurring at station 7C prior to March, 2005.

Respectfully submitted,

Margery A. Lanier
MARIS & LANIER, P.C.